**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL HERNANDEZ, Individually and On ) <br> Behalf of All Others Similarly Situated, ) <br> ) <br>            Plaintiff, ) <br> ) <br>    v. ) <br> ) <br> BAUSCH & LOMB, INC., BAUSCH & ) <br> LOMB, INC. EMPLOYEE BENEFITS ) <br> ADMINISTRATION COMMITTEE, ) <br> BAUSCH & LOMB, INC. BOARD OF ) <br> DIRECTORS, RONALD L. ZARRELLA, ) <br> WILLIAM M. CARPENTER, DAVID ) <br> NACHBAR, JURIJ Z. KUSHNER, <br> EFRAIN RIVERA, and ALAN H. <br> RESNICK, <br> <br>            Defendants. | Civil Action No.  06-cv-04152 <br> <br> **CLASS ACTION** <br> <br> JURY TRIAL REQUESTED |

       Plaintiff  Paul Hernandez ("Plaintiff"), a participant in the Bausch & Lomb, Inc. 401(k) Account Plan (the "Plan") during the proposed Class Period (defined below), on behalf of the Plan, himself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

       1.       This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

       2.       Plaintiff was employed with Bausch & Lomb, Inc. (hereinafter sometimes referred to as the "Company" or "BLI") and was a participant in the Plan during the Class Period, during which time the Plan held interests in the common stock of the Company. Plaintiff's retirement investment portfolio in the Plan during the Class Period included Bausch & Lomb, Inc. stock.

3.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of their retirement investment portfolio.  Common stock of BLI was one of the investment alternatives of the Plan throughout the Class Period.

4.     Plaintiff alleges that Defendants, as fiduciaries of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to them and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's significant holdings of BLI stock.

5.     Specifically, Plaintiff alleges in Count I that the Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer BLI common stock as a Plan investment option for participant contributions when it was imprudent to do so; (2) maintaining the Plan's pre-existing heavy investment in BLI equity when Company stock was no longer a prudent investment for the Plan; and (3) by failing to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single"-minded fiduciaries with only the Plan's and best interests in mind.  These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     Plaintiff's Count II alleges that certain Defendants failed to communicate to Plan participants complete and accurate information regarding the Plan's investment in BLI securities sufficient enough to advise participants of the true risks of investing their retirement savings in Company stock.

7.     Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan

assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering BLI stock as an investment option and investing Plan assets in BLI stock when it was no longer prudent to do so.

8. Plaintiff alleges that Defendants allowed the significant imprudent investment of Plan assets in BLI equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained below in detail, among other things, (a) the defective nature of the Company's ReNu with MoistureLoc product line; (b) internal corporate malfeasance regarding the financial reporting, management and controls of a number of the Company's subsidiaries; (c) the fact that financial and other statements issued by the Company during the Class Period were materially misleading, inaccurate and incomplete as presented to Plan participants; and (e) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to its participants.

9. This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. § 1109.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with Plan accounts invested in Company stock during the Class Period, as defined below, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district.

3

## PARTIES

### Plaintiff

12.     Plaintiff, Paul Hernandez, is a "participant" in the Plan, within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held BLI shares in his retirement investment portfolio during the Class Period.

### Defendants[1]

### Bausch & Lomb, Inc.

13.     Defendant, Bausch & Lomb, Inc., is a New York corporation with its principal executive offices located at One Bausch & Lomb Place, Rochester, New York 14604-2701. During the Class Period, the Company developed, manufactured and marketed multiple eye health products.  The company offers its products in five product categories: contact lens, lens care, pharmaceuticals, cataract and vitreoretinal, and refractive.

14.     BLI was the named Plan sponsor on the Plan's Form 5500 Submission to the Internal Revenue Service ("IRS") and Department of Labor (DOL) during the Class Period. Further, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and was therefore a fiduciary of the Plan in its own right.  BLI acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

15.     BLI had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, BLI had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board of

---

[1] There may be certain unnamed defendants that were fiduciaries of the Plan during the Class Period, whose identities are currently unknown to plaintiff.  To the extent that identities of additional fiduciaries are ascertained through discovery, plaintiff will seek leave to join them as defendants.

Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries. Accordingly, the actions of the Board of Directors, the Plan's administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

**Employee Benefits Administration Committee**

16.    Defendant, Bausch & Lomb, Inc. Employee Benefits Administration Committee (the "Committee"), is designated as the Plan Administrator, according to the Plan's Form 11-K submission to the United States Securities and Exchange Commission for the years 2003 and 2004("2003 11-K" & "2004 11-K"). The Committee was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Director Defendant[2]**

17.    The Company's Board of Directors (the "Board") was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets. Indicative of the Board's authority, as more fully described below, was its responsible for determining the amount, if any, of any additional discretionary contributions by the Company to the Plan (in addition to the Company's basic match contribution).

---

[2] Plaintiff believes that additional members of the Board and/or Committee(s) of the Board were fiduciaries of the Plan in that they had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan. To the extent that the identities of further fiduciaries are ascertained through discovery, plaintiff will seek leave to join them as additional defendants.

18.     Additionally, the Board was also responsible for selecting and monitoring the members of the Plan committee(s) responsible for managing the operation and administration of the Plan, as well as evaluating the investment performance of Plan assets.

19.     Defendant Ronald L. Zarrella ("Zarrella") served as the Company's Chairman and Chief Executive Officer from November 9, 2001 to the present.  Defendant Zarrella is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant Zarrella is hereinafter referred to as the "Director Defendant."

**Individual Defendants[3]**

21.     Defendant David Nachbar ("Nachbar") served as Senior Vice President of Human Resources of BLI during the class period.  Upon information and belief, Defendant Nachbar was a member of the Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     Defendant Jurij Z. Kushner ("Kushner") served as the Company's Vice President and Controller during the Class Period.  Upon information and belief, defendant Kushner was a member of the Employee Benefits Administration Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     Defendant Efrain Rivera ("Rivera") served as the Company's Vice President and Treasurer during the class period.  Upon information and belief, Defendant Rivera was a member

_____

[3] Plaintiff believes that there are individuals (whose identities are currently unknown) who are/were members of the Employee Benefits Administration Committee during the class period and as such are fiduciaries of the Plan within the meaning of ERISA.  To the extent that the identities of additional fiduciaries are ascertained through discovery, plaintiff will seek leave to join them as additional defendants.

of the Employee Benefits Administration Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     Defendant Alan H. Resnick ("Resnick") served as the Company's Vice President and Treasurer during the class period. Upon information and belief, Defendant Resnick was a member of the Committee and a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

## THE PLAN

25.     The Bausch & Lomb, Inc. 401(K) Account Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plan and its participants/beneficiaries. Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

26.     During the Class Period, the Plan covered substantially all United States employees of the Company, if on the date of hire the employee was scheduled to work at least 1,000 hours per Plan year. *See* 2004 11-K.

27.     Under the Plan, individual accounts are maintained for each Plan participant to reflect the participant's contributions and Company contributions. Income and loss is allocated to the participant's accounts based on the ratio of the account balance of the individual participant to the aggregate of all account balances of all participants in the fund within the Plan.

28.     Each participant had the option, for each payroll period, to elect to contribute a portion of their eligible pre-tax compensation through directed reductions of their payroll.[4] In addition, each participant could elect to contribute an additional 1% to 6% of compensation on

---

[4] Upon information and belief, prior to January 1, 2002, the maximum percentage was 15%. The maximum percentage was raised to 50% effective January 1, 2002.

an after-tax basis.  However, each participant's rate of pre-tax savings contributions when added to the rate of after-tax savings and contributions is not allowed to exceed a percentage of the participant's eligible compensation.[5]

29.     The Company is required to match, from its profits, an amount equal to 150% of the first 5% of each participant's pre-tax savings contributions, plus 50% of the next 2% of the participant's pre-tax savings contributions, provided the participant completed one year of service to the Company.[6]

30.     The Company also makes a base contribution in an amount equal to 2.5% of each participant's eligible compensation, regardless of whether the employee chooses to contribute.[7]

31.     All Company contributions are automatically invested in Bausch & Lomb, Inc. common stock and must remain in this fund option until the participant reaches the age of 55.[8]

32.     Each participant could invest their account in any of several investment fund options selected and maintained by the Plan's fiduciaries.  Participants could elect to transfer all or any portion of their account balances from among the various investment options.  One of the investment options was the Bausch & Lomb, Inc. Stock Fund.  As of December 31, 2004, the Company offered at least 8 separate investment options.

33.     Upon information and belief, each and every Plan participant had Company stock in their Plan account during the Class Period.

34.     All active participants are immediately vested in their contributions, as well as all

---

[5] Upon information and belief, prior to January 1, 2002, the maximum percentage was 21%.  The maximum percentage was raised to 56% effective January 1, 2002.

[6] Prior to January 1, 2005, the Company's matching contribution was an amount equal to 100% of the first 3% of each participant's pre-tax savings contributions, plus 50% of the next 2% of the participant's pre-tax savings contributions, provided the participant completed one year of service to the Company.

[7] Prior to January 1, 2005, the Company made a base contribution in an amount equal to .5% of each participant's eligible contribution.

[8] Effective January 1, 2005, Company contributions, which are invested in the Bausch & Lomb, Inc. Stock Fund, are no longer required to remain in this fund option until the participant reaches age 55.

Company contributions.[9]

35.     As of December 31, 2004, Company stock accounted for approximately 39% of the Plan's assets.  *See* 2004 11-K.

36.     The Plan is administered by the Employee Benefits Administration Committee, which is appointed by the Board of Directors of the Company.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Bausch & Lomb, Inc. 401(K) Account Plan at any time between June 1, 2005 through the present (the "Class Period") and whose accounts included investments in BLI stock.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included part of the Plan's investment in BLI stock.[10]

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act

---

[9] Employees hired on or after January 1, 2005 become 100% vested for the Company base and matching contributions after three years of service.

[10] By way of illustration, the Plan's Form 5500 for Plan year 2004 indicated that, as of December 31, 2004, the Plan had 5,433 active participants.

prudently and solely in the interests of the Plan and the

Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Plan and members of the Class have sustained damages and, if

so, what is the proper measure of damages.

40.     Plaintiff's claims are typical of the claims of the members of the Class because

Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the

Defendants' wrongful conduct in violation of federal law as complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action, complex, and ERISA

litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the

Class.

42.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B)

because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the actions, or substantially

impair or impede their ability to protect their interests.

43.     Class action status is also warranted under the other subsections of Rule 23(b)

because: (i) prosecution of separate actions by the members of the Class would create a risk of

establishing incompatible standards of conduct for Defendants; and/or (ii) Defendants have acted

or refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY STATUS**

44.     During the Class Period, upon information and belief, Defendants had

discretionary authority with respect to the management of the Plan and/or the management or

disposition of the Plan's assets.

45.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan

pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

46.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, the Company, the Board and the Committee were named fiduciaries of the Plan.

47.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, BLI chose to internalize this fiduciary function.

48.     Upon information and belief, the Plan was administered by the Board of Directors through the Committee, which had discretionary authority to manage and control the operation and administration of the Plan and investment of its assets, as noted above.  The Board of Directors was responsible for appointing, evaluating and monitoring the Plan Committees, including members and delegees.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

49.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions.  Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

50.     Further, ERISA mandates that Plan fiduciaries have a duty of loyalty to the Plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to Plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, Plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to

correct the inaccurate or misleading information so that Plan participants will not be injured. *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions.")(emphasis added); *Jones v. Am. Gen. Life & Accident Ins. Co.,* 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

51.     During the Class Period, upon information and belief, Defendants' made direct and indirect communications with Plan participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions and Prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Defendants also acted as fiduciaries to the extent of this activity.

52.     Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the plans' participants, well-recognized in the 401(k) literature and the trade press,[11] concerning investment in company stock, including that:

> (a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;
>
> (b)     Out of loyalty, employees tend to invest in company stock;
>
> (c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

---

[11]      Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement processional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company sock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

53.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock, they still disseminated materially inaccurate, incomplete and misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## **DEFENDANTS' CONDUCT**

54.     During the Class Period, the Company developed, manufactured and marketed multiple eye health products.  Its product lines include soft and rigid gas permeable contact lenses and lens care solutions and ophthalmic surgical and pharmaceutical products.

55.     BLI conducts business in, among other places, the United States, Brazil, Korea, and China.

56.     Throughout the Class Period, the Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants.  Defendants also concealed serious formulation, demand, developmental and marketability problems with the Company's products.  At the same time, Defendants reassured Plan participants and did nothing to protect the substantial investment of their retirement savings in BLI stock.

**Improper Management and Accounting Practices at BLI's Brazilian and Korean Subsidiaries Necessitating Restatement of Financial Results**

57.     On July 27, 2005, BLI issued (and filed with the SEC as an exhibit to a Current Report on Form 8-K) its financial results for the quarter ended June 25, 2005.  The press release reported a 7% increase in net sales for the second quarter of 2005 over the same period in 2004, and net income of $45.0 million in the second quarter and $79.6 million in the first six months of 2005.  Defendant Zarrella provided a strong outlook for the Company's performance stating "Given our performance to date, and recognizing that new products and further share gains are expected to accelerate top-line growth in the second half of 2005, we have upwardly revised our outlook for the full year."

58.     The statements about the Company's financial results for the second quarter and first six months of 2005 were repeated in the Company's Quarterly Report on Form 10-Q (the "Second Quarter 2005 Form 10-Q") that was filed with the SEC on July 28, 2005.  The Second Quarter 2005 Form 10-Q also included certifications by defendant Zarrella with respect to the accuracy of the financial statements included in the Form 10-Q and the effectiveness of the Company's internal controls.

59.     The information and statements contained in paragraphs 57 and 58 were materially misleading, inaccurate and incomplete when made because defendants failed to disclose or indicate the following: (1) that the Company's Brazilian subsidiary engaged in fraudulent management and accounting practices, which resulted in tax assessments against the Company by Brazilian authorities; (2) that the Company's Korean subsidiary engaged in improper sales practices, thereby causing BLI to improperly recognize revenue from such sales; (3) that the Company lacked adequate internal financial, operational and quality controls; (4) that the Company's financial results were materially overstated by at least $2.8 million in the first six months of 2005, and the company's net income was overstated by at least $0.3 million in the second quarter and by at least $1.5 million in the first six months of 2005; and (5) that the Company's financial results were in violation of GAAP.

**The True Nature of BLI's Control Weaknesses, Inaccurate Financial Reporting and Improper Management Practices Begins to Emerge**

60.　　On October 26, 2005, BLI issued a press release revealing for the first time that the Company's Audit Committee commenced an independent investigation in September 2005 into allegations of misconduct by the management of its Brazilian subsidiary, BL Industria Otica, Ltda. ("BLIO") and resultant past tax assessments against BLIO by Brazilian taxing authorities. The Audit Committee of the Board engaged the services of the law firm of Cahill Gordon & Reindel, LLP to assist with the investigation.

61.　　The October 26, 2005 press release also revealed that the Company reported these matters to the Northeast Regional Office of the SEC, which commenced an informal inquiry into the allegations.  The Company also revealed the termination of the employment of the general manager and controller of BLIO with the director of operation of BLIO serving as acting general manager of the subsidiary pending conclusion of the investigation.

62.　　The Company disclosed in the October 26, 2005 press release that it may delay the filing of its Quarterly Report on Form 10-Q for the third quarter of 2005.

63.　　The allegations of misconduct contained in the October 26, 2005 press release were as follows: the general manager, the controller and other employees of BLIO engaged in improper management and accounting practices, including among other things, the mischaracterization of expenses to fund an unauthorized local pension arrangement for the benefit of themselves and other members of local management, the avoidance of Brazilian payroll tax obligations, and the  misuse of Company assets for personal benefit.

64.　　As a result of the aforementioned investigation conducted by the Audit Committee, it was learned that Brazilian tax authorities made tax assessments against BLI's Brazilian subsidiary for unpaid taxes totaling approximately $5 million, interest of approximately $7 million, plus approximately $21 million in claimed penalties relating back to earlier periods.

65.　　On November 29, 2005, BLI filed with the SEC a Current Report on Form 8-K

stating that the Audit Committee's investigation was continuing and that the Company was considering whether any restatement of prior-period financial statements would be required under GAAP.

66.     On December 22, 2005, BLI filed with the SEC a Current Report on Form 8-K providing an update on the investigation of improper conduct by management of its Brazilian subsidiary.  Based on its investigation, the Company concluded that certain prior period financial statements will be required to be restated, including fiscal years ended 2000, 2001, 2002, 2003, 2004 and the fist and second quarters of 2005.

67.     In Form 8-K filed on December 22, 2005, BLI also revealed a material weakness relating to the detection and prevention of management fraud causing the override of existing controls leading to the untimely identification and resolution of certain tax accounting matters with respect to BLIO.

68.     BLI further revealed in its December 22, 2005 Form 8-K that in late November 2005, the Audit Committee commenced an independent investigation into revenue recognition practices in its Korean subsidiary, BL Korea, and that the SEC had been notified of this investigation.

69.     On March 17, 2006 BLI issued a news release, "Bausch & Lomb Updates Status of Financial Reporting," announcing a delay in its SEC 10-K filing due March 16, 2006, which it expected to file by April 30, 2006.  The Company stated that the delay was due to misconduct at BLIO, necessitating the need to restate 2000 through 2004 earnings; its ongoing independent investigation of alleged improper sales practices at BL Korea, which the Company estimated would reduce previously reported net sales for 2002 through 2004 and the first and second quarters of 2005; and that the Company had not completed its required assessment of its internal controls over financial reporting and control deficiencies previously disclosed in December 22, 2005.

70.     BLI continued to be plagued by allegations of mismanagement and accounting improprieties.  On March 23, 2006, an AP article titled, "Bausch & Lomb Debt Could Slip to

Junk" discussed potential ramifications of the Company's delay in filing its annual 10-K report, including downgrading the Company's corporate credit rating to slightly above high-yield junk, thereby increasing borrowing costs.

71.     As a result of its inability to timely file its 10-K report with the SEC, on May 3, 2006 BLI announced its intention to commence tender offers and consent solicitations on debt instruments. *See* Bausch & Lomb news release, "Bausch & Lomb Announces Intention to Commence Tender Offers and Consent Solicitations on Debt Instruments."

72.     On May 4, 2006, a Reuters news article titled, "Debt buyback may leave Bausch short of cash: analyst," reported that the Company's stock was "trading near three-year lows" and it had "fallen nearly 40 percent" in 2006, making it the weakest health-care stock in Standard & Poor's 500 index. The article also discussed potential cash reduction following debt buyback that may be of concern given allegations of a link between eye infections and the Company's ReNu lens solutions which may result in medical legal liability (as discussed herein below).

73.     A May 8, 2006 news article titled, "Bausch says sees new charges from probes," reported the Company's anticipated new charges arising from accounting irregularities at its foreign subsidiaries, resulting in revenue recognition adjustments for sales in Korea from 2002 to 2005, with the unaudited effect of the recognition adjustments expected to reduce previously reported net sales by approximately $1.2 million for the first and second quarters of 2005, and approximately $7.2 million for 2002-2004. The article also outlined the Company's expected restatement of prior-period financial results for sales in Thailand, Japan, and China, resulting in a cumulative reduction of net sales of $ 2.9 million for the first and second quarters of 2005, and $15.4 million for the period 2001-2004. The article also disclosed the Company's previously reported net income reduction of $19 million resulting from the Brazil investigation.

74.     Upon information and belief, the Company, the Director Defendant (as well as BLI Board of Directors and/or the Audit Committee of the Board of Directors, and the Company's high-ranking officer) had knowledge of the control weaknesses, inaccurate and unlawful financial reporting, and improper management practices at least as early as August 1,

17

2005 and failed to provide this material information to Plan participants or correct the ongoing misconceptions about the financial health and reporting of the Company and its problematic internal controls.[12]

**Links between BLI's Manufacture and Sale of ReNu® with MoistureLoc® Solution and Contact Lens-Related Eye Infections**

75.     During the Class Period, BLI's product line included contact lens cleaning solutions, ReNu with MoistureLoc, and ReNu MultiPlus, which BLI produced in its Greenville, South Carolina plant and sold in the United States, Europe, and Asia.

76.     According to BLI's April 10, 2006 news release, the ReNu product line generated sales of approximately $45 million in the United States.

77.     The Hong Kong Department of Health became aware of an increased incidence of Fusarium keratitis in July and August 2005 and requested information from BLI, according to an article by Bloomberg published on April 27, 2006 and quoting Diana Fan, a spokeswoman for the Hong Kong Department of Health.  BLI spokeswoman Meg Graham was quoted by the *Wall Street Journal* on April 27, 2006 that the Hong Kong Department of Health "noted an increase in hospital admissions due to contact lens related keratitis from **June to September 2005**." (emphasis added).

78.     In or about September 2005, officials with Hong Kong's Health Department notified Bausch & Lomb of cases of fungal keratitis, an inflammation of the cornea among users of BLI's ReNu with MoistureLoc solution.  Although officials tested the solution and found no signs of contamination at that time, Hong Kong health officials subsequently noted additional cases of corneal infections in users of ReNu with MoistureLoc.  *See* 4/27/06 *Reuters/Yahoo*, "Update 1-H told Bausch & Lomb of eye infections in Sept."

---

[12] Defendants and other Company Directors and Officers may have known of the problems described herein before August 2005, but this is impossible to discern without discovery.

79.     On November 13, 2005, BLI sent a letter to the U.S. Food and Drug Administration ("FDA") identifying twenty-five (25) cases of ReNu users in Hong Kong who developed Fusarium keratitis.

80.     On February 17, 2006, the Singapore Ministry of Health issued a press release containing an alert regarding twenty-two (22) cases of Fusarium keratitis in Signapore, noting that 21 of the 22 patients used ReNu multipurpose contact lens solution.  The alert stated that three of the patients required cornea transplants due to significant loss of vision.

81.     On February 21, 2006, the Singapore Ministry of Health issued a press release identifying 39 cases of Fusarium eye infections, of which 34 were ReNu users.

82.     In February 2006, Hong Kong health officials contacted BLI officials once again after observing further occurrences of fungal keratitis.  *See* 4/27/06 *Reuters/Yahoo*, "Update 1-H told Bausch & Lomb of eye infections in Sept."

83.     In February 2006, BLI withdrew its ReNu with MoistureLoc solutions from the Asian market.  *See* 4/27/06 Reuters/Yahoo, "Update 1-H told Bausch & Lomb of eye infections in Sept."  However, BLI continued to sell the ReNu with MoistureLoc solutions in the United States and Europe.

84.     On March 8, 2006, the Centers for Disease Control and Prevention ("CDC") received a report from an ophthalmologist in New Jersey about three patients with "contact lens-associated Fusarium keratitis during the preceding 3 months," according to a CDC press release on April 10, 2006.  The CDC and FDA began an investigation into Fusarium keratitis cases in the United States and requested information from BLI.  The Company publicly disclosed the investigation on March 31, 2006, but denied that there was any relationship between the eye infections and any specific lens-care product.

85.    In a March 31, 2006 news release, BLI announced it was collaborating with experts to investigate instances of fungal eye infections, and it stated that it believed that the root cause of such infections was not related to a specific contact lens or lens-care product; it announced its prior suspension of sales in Singapore and Hong Kong; and it advised that it expected the situation would reduce first quarter revenues in Asia by as much as $10 million.

86.    On April 10, 2006, BLI issued a news release announcing the temporary suspension of U.S. shipments of ReNu with MoistureLoc produced at its Greenville, S.C. manufacturing facility.  BLI stated that other Bausch & Lomb products were not affected.

87.    On April 12, 2006 BLI voluntarily withdrew its ReNu with MoistureLoc solution from sale in China.  *See* April 12, 2006 news article, "Bausch & Lomb halts sales of some lens solution in China."

88.    On April 12, 2006, Singapore's Ministry of Health reported an additional 36 cases of fungal corneal infection, and it stated that out of 75 reported cases, 94.4% reported using BLI's ReNu with MoistureLoc solution.  *See* April 12, 2006 Singapore Ministry of Health News Release.

89.    On April 13, 2006, BLI issued a news release announcing its request that retailers remove ReNu with MoistureLoc from their shelves pending conclusion of the investigation into reports of fungal keratitis; it advised that to date it had found nothing linking ReNu with MoistureLoc with the infections.

90.    On April 26, 2006, the Company first publicly acknowledged in a statement to the *Wall Street Journal* that the Hong Kong health authorities notified it of Fusarium keratitis infections in users of ReNu solutions no later than November 2005, three months before the Company stopped selling ReNu in Hong Kong and five months before the Company publicly disclosed the association between ReNu and eye infections in the United States.  In fact according to an article published by the *Wall Street Journal* on April 27, 2006, Diana Karn, a

spokeswoman for the Hong Kong Health department, stated that the Hong Kong Health Department informed BLI about the Fusarium keratitis cases linked to ReNu in September 2005.

91.    On May 3, 2006, BLI issued a news release disclosing preliminary data from the CDC findings as of May 2, 2006 that 27% of reported eye infections occurred among users of its ReNu MultiPlus solution, and 57% of cases preliminarily reported used its ReNu with MoistureLoc solution.

**Defendants Knew or Should Have Known that BLI stock was an Imprudent Investment for the Plan**

92.    At all relevant times, Defendants knew or should have known that BLI stock was an imprudent investment in the Plan, as a result of (a) BLI's management, controls and financial reporting problems regarding its Brazilian and Korean subsidiaries, (b) defects regarding its ReNu with MoistureLoc solution resulting in worldwide removal of the product from sale, and (c) the inevitable drop in the value of Company stock as the truth emerged and the problems continued.

93.    Due to their high ranking positions within the Company – especially the Director Defendant -- Defendants knew or should have known of the existence of the above-mentioned problems.

94.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining, public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in BLI stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

95.    In addition, the Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

96.    Defendants failed to conduct an appropriate investigation into whether BLI  stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's

participants with information regarding BLI's tremendous problems so that participants could make informed decisions regarding BLI stock in the Plan.

97.     An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in BLI stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

98.     Because Defendants knew or should have known that BLI was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in BLI stock.

99.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of BLI stock; discontinuing further contributions to and/or investment in BLI stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by BLI they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of BLI stock.

100.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plan's investment in BLI stock.  In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as BLI's problems came to light.

**Defendants Regularly Communicated with the Plan's Participants Regarding Investments in BLI Stock Yet Failed to Disclose the Imprudence of Plan Investment in BLI Stock**

101.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, through SEC filings, related announcement and through other media, about the performance, future financial and business prospects of the

Company's common stock, which was, far and away, the single largest asset of the Plan. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing (and/or disseminating) incomplete and misleading) negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

102.    The SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plan and its participants to imprudently purchase, and to hold and maintain, Plan investments in BLI stock.

103.    Specifically, these statements, their related press releases, and substantially similar SEC filings and press releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plan's participants of the Company's ever-increasing problems with its key product lines, including functional problems, market saturation and shrinking demand. These statements were made with the implicit knowledge that the Plan's participants would rely upon such information in determining whether to maintain investment in BLI stock.

104.    BLI's SEC filings, including Form 14 DEF Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officer's compensation is in the form of stock grants or stock option grants. *See* BLI's March 24, 2005 Form 14 DEF Proxy Statement.

105.    Because the compensation of at least several of the Defendants was significantly tied to the price of BLI stock, Defendants had incentive to keep the Plan's assets heavily invested in BLI stock on a regular, ongoing basis. Elimination of Company stock as a Plan investment option would have reduced the overall market demand for BLI stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of BLI stock, resulting

in lower compensation for the Defendants.

106.    Some Defendants may have had no choice in tying their compensation to BLI stock (because compensation decisions were out of their hands), but Defendants did have the choice whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in BLI stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

107.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single." *See generally Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

108.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

109.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

110.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

111.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan ***solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence*** under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

112.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the **duties of loyalty, exclusive purpose and prudence** and are the "highest known to the law."  They entail, among other things:

a.     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.     A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

113.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

114.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

115.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

116.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

117.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

118.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

119.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan as described herein.  Investment in the Company stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.  During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect the Plan and its participants from the inevitable losses that they knew would ensue as the non-disclosed material problems and business concerns took hold and became public.

120.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

121.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

122.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

123.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

124.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries by all Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA)**

125.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

126.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

127.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan-related communications and material disclosures.

128.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all of the Plan's investment options, including investment in Company stock.

129.    Defendants knew that investment in Company stock carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

130.    Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook.  These failures were particularly devastating to the Plan and its participants—losses in this investment had an enormous impact on the value of participants' retirement assets.

131.    These actions and failures to act were uniform and caused the Plan, and/or the participants and beneficiaries of the Plan, to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the Plan's participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding the Company stock.

132.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

133.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company stock and were material to any reasonable person's decision about whether or not to invest or maintain

29

any part of their invested assets of the Plan in the Company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

134.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

135.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by BLI & Director Defendant)**

136.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

137.    At all relevant times, as alleged above, BLI and the Director Defendant were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

138.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of BLI and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries (including the members of the Committee).

139.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, BLI and the Director Defendants, had the duty to:

(1)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(4)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)     Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

140.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

141.    BLI and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries

completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  BLI and the Director Defendant knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the BLI stock fund as an investment alternative for the Plan, and (ii) continuing to invest the assets of the BLI stock fund in BLI stock when it no longer was prudent to do so.  Despite this knowledge, BLI and the Director Defendant failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

142.    In addition, BLI and the Director Defendant, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of BLI that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

143.    BLI and the Director Defendant are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

144.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

145.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

146.    The Plan suffered at least millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

147.    Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants failed to apprise participants of the defective nature of their products (particularly ReNu with MoistureLoc); the manufacturing problems regarding ReNu with MoistureLoc; the financial reporting, managerial and control concerns leading to the above described restatement of earnings; and the fact that the value of Company stock was in serious, long-term trouble.  Thereby, Defendants misrepresented and failed to appropriately inform the participants of the soundness of Company stock as an investment vehicle.  As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

148.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

149.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

150.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to

make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

151.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

152.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

153.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

### SECTION 404(c) DEFENSE INAPPLICABLE

154.    The Plan suffered a loss, and Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in BLI Stock during the Class Period in violation of the Defendants' fiduciary duties.

155.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan

satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

156.   Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary."  29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

157.   As alleged above, Defendants failed to provide participants with complete and accurate information regarding BLI stock in the Plan.   Accordingly, participants failed to exercise the requisite independent control over their investment in BLI stock in the Plan.

158.   In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

159.   The Defendants' liability to the Plan, Plaintiff and the Class for relief stemming from the Plan's imprudent investments in BLI Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.     A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Bausch & Lomb, Inc. maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of BLI;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H     An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: May 31, 2006               Respectfully submitted,

**BRODSKY & SMITH, LLC**

By: */s/ Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741- 0626 (facsimile)

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Terence S. Ziegler, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

**Attorneys for Plaintiff**